S02Z0893. IN THE MATTER OF: INQUIRY CONCERNING A JUDGE, JQC NOS. 01-44, 01-73, 01-89, 01-90.
(566 SE2d 310)

PER CURIAM.

This matter concerns the recommendation of the Judicial Qualifications Commission ("JQC") that Chief Magistrate Judge R. Joseph Hammill of the Glynn County Judicial Circuit be disciplined for reasons relating to his judicial conduct. Four members of the JQC have recommended that Judge Hammill be suspended from his duties without pay for six months, while three members of the JQC have recommended that Judge Hammill be removed from the bench immediately. Having reviewed the record of the JQC's inquiry, we conclude that Judge R. Joseph Hammill has demonstrated legal incompetence in his judicial capacity, has acted in a manner that is inappropriate for (and detrimental to) the judiciary, and has disregarded the law as applied to his own conduct. Accordingly, we order that Judge Hammill be immediately and permanently removed from the bench.

R. Joseph Hammill was appointed a pro-tem judge for the City of Brunswick in 2000, and shortly thereafter sought election to the Chief Magistrate position for Glynn County. He won a contested primary, and was unopposed in the general election. Shortly after Judge Hammill was sworn in as Chief Magistrate for Glynn County, the JQC began to receive complaints regarding his conduct as a judge. The JQC initiated an inquiry into Judge Hammill's actions and then sought a temporary injunction to prevent the judge from sitting on the bench. On the day of a hearing scheduled to consider that request, Judge Hammill agreed to a 90-day paid suspension from his judicial duties, during which time he would receive judicial education, training, and mentoring.[1] During his 90-day suspension, Judge Hammill observed proceedings in the Savannah Magistrate Court, discussed courtroom procedures with other magistrate judges, studied several training manuals for judges, and attended two state and one national judicial training seminars.

Following the suspension, the JQC met with Judge Hammill to discuss the complaints filed against him and the training he received while suspended from the bench. Thereafter, the JQC filed formal charges against the judge, which were amended to include newly-received complaints.

A formal JQC hearing was held, at which 28 witnesses, including Judge Hammill, testified. Thereafter, the JQC issued its findings and recommendations, in which it determined that clear and convincing evidence existed to show that Judge Hammill had violated (in whole or in part) Canons One,[2] Two,[3] Three,[4] and Five[5] of the Code of Judicial Conduct ("CJC"). Based upon that determination, four members of the JQC have recommended to this Court that Judge Hammill be

---

[1] On June 4, 2001, with the JQC's consent, this Court approved of Judge Hammill's voluntary temporary suspension.

[2] Canon One provides that: "Judges should uphold the integrity and independence of the judiciary." The commentary to Canon One emphasizes that judges must comply with the law and the Code of Judicial Conduct in order to foster the public's confidence in the judiciary and the legal system.

[3] Canon Two provides that: "Judges should avoid impropriety and the appearance of impropriety in all their activities." The commentary to Canon Two notes that public confidence in the judiciary is "eroded by [the] irresponsible or improper conduct of judges."

[4] Canon Three requires judges to "perform the duties of judicial office impartially and diligently." Subsection (B) of Canon Three states that judges must require order and decorum in all proceedings, and requires judges to hear and decide matters assigned to them; to be faithful in the law and maintain professional competence therein; and to be patient, dignified, and courteous to litigants, jurors, witnesses, and others with whom they deal professionally.

[5] Canon Five requires judges to regulate their extra-judicial activities to minimize the risk of conflict with their judicial duties. This Canon states that judges should not serve as fiduciaries, executors, trustees, administrators, or guardians, except in connection with family members and only when such service will not interfere with their judicial duties. Canon Five also prohibits judges from practicing law, unless they are allowed to do so by law.

suspended from the bench for at least six months without pay, that he be publicly reprimanded, and that he only be reinstated upon executing a written commitment that henceforth, he will conduct himself in accordance with the CJC. The remaining three members of the JQC have recommended that Judge Hammill be permanently removed from the bench instanter.

It is this Court's function "to review the findings of the Commission, and to exercise its judgment based upon the entire record" in order to determine whether Judge Hammill's conduct warrants discipline, and, if so, what sanctions should be imposed. *In the Matter of: Inquiry Concerning a Judge*, 265 Ga. 843 (462 SE2d 728) (1995). In performing this independent function, we give substantial consideration and due deference to the JQC's ability to evaluate the credibility of the witnesses who appear before it. However, this Court reaches its own conclusions regarding disciplinary sanctions against a sitting judge, and the recommendations of the JQC are not binding upon us. Id. In reaching our determination, this Court employs the "clear and convincing proof" standard to decide whether allegations against a judge are established by the evidence of record. Id.

Any judge may be "removed, suspended, or otherwise disciplined for willful misconduct in office, or for . . . conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const. (1983), Art. VI, Sec. VII, Par. VII. In this matter, Judge Hammill's conduct, discussed in more detail below, does not involve judicial corruption, personal dishonesty, or moral turpitude. Nor is it clear that Judge Hammill was prohibited by the CJC from representing certain pre-existing clients after assuming judicial office. However, after reviewing the entire record, we conclude that Judge Hammill has demonstrated incompetence in areas of the law that are crucial to a magistrate's duties, has exhibited a cavalier disregard for the law as applied to his own conduct, and has by his actions eroded public confidence in the judiciary. Moreover, Judge Hammill has engaged in behavior that is entirely inappropriate for members of the judiciary and has demonstrated an immoderate lack of judicial decorum and temperament. Considered in isolation, none of Judge Hammill's actions would warrant his removal from the bench. Considered as a whole, however, Judge Hammill's actions demonstrate a troubling pattern of ineptitude and misconduct, and lead us to conclude that he is not fit to serve on the Magistrate Court. We therefore order that Magistrate Judge R. Joseph Hammill be permanently and immediately removed from judicial office.

1. Based upon the five incidents described below, we accept the JQC's findings that Judge Hammill has failed to maintain professional competence in the law, has acted in an improper manner that diminishes public confidence in the judiciary, and has failed to main-

tain the decorum and dignity of the judicial office, thereby violating Canons Two and Three of the CJC.

*The Ames Matter.* Shortly after taking office as Chief Magistrate, Judge Hammill met with Glynn County police officers regarding an incident in which an officer was bitten by a dog. The dog had been quarantined and its owner, Denise Ames, had moved to Virginia. Ames did not attend, and was not notified of, the ex parte meeting. Thereafter, Judge Hammill ordered that before Ames could retrieve her dog, she had to pay $1,478 in animal control fees, lost wages, and medical bills resulting from the biting incident. At the JQC hearing, Judge Hamill stated that even though Ames was denied both notice and an opportunity to be heard at the ex parte hearing, her due process rights were not violated because she could challenge the order after it was entered.

*The O'Donnell Matter.* A Glynn County associate magistrate, Chris O'Donnell, saw the order against Ames and brought it to the attention of Glynn County's Chief Superior Court Judge, James Tuten. Judge O'Donnell then told Judge Hammill that he believed the Ames order was improper and that he had shown it to Judge Tuten. As Chief Magistrate, Judge Hammill was responsible for scheduling the associate magistrates to sit on the bench. In retaliation for Judge O'Donnell's actions regarding the Ames matter, Judge Hammill did not schedule O'Donnell to sit as a magistrate for over three months. Judge O'Donnell testified that at no time did Judge Hammill attempt to speak to him about this matter. For his part, Judge Hammill claims he did try to speak with O'Donnell, but O'Donnell refused. At the JQC hearing, Judge Hammill stated that he felt O'Donnell had "betrayed" him and that he expected better loyalty from his associate magistrates. When pressed at the hearing about whether his decision not to schedule O'Donnell to sit on the bench was a retaliatory measure, Judge Hammill's answers were evasive and contentious.

*The Vespini Matter.* When Vespini appeared before Judge Hammill on a domestic disturbance charge, the judge asked whether he had any guns in his home. Vespini said that he did and was taken out of the courtroom. Judge Hammill then instructed a deputy sheriff to go to the Vespini home and remove the firearms. The deputy stated that he was unwilling to do so without written authorization. Judge Hammill then drew up an order that contained no heading or style, directing the deputy sheriff to go to the Vespini home and remove all weapons found therein. At the JQC hearing, Judge Hammill opined that this did not amount to an improper and warrantless search of Vespini's home, because Vespini had consented in court to the removal of his weapons. However, Vespini testified before the JQC that Judge Hammill never asked whether he consented to having the

weapons removed, and that he never gave such consent.[6]

*The Jackson Matter.* In January 2001, Judge Hammill presided over a bench trial in a suit seeking money damages for a defective home sold by Marcia Jackson. No evidence regarding damages was submitted during trial. Judge Hammill entered an order that found for the plaintiff but awarded no damages. The order stated that damages exceeding $8,000 were claimed, and left the damages issue open. Jackson filed an appeal to the superior court. Thereafter, Judge Hammill received ex parte communications from the plaintiff regarding damages and, without notifying Jackson or holding a second hearing, entered an order requiring Jackson to pay $7,800 in damages.

*The Gibson Matter.* Attorney Gibson's client was charged with shoplifting in a prosecution that was pending in state court. In October 2001, after his 90-day suspension, Judge Hammill telephoned Attorney Gibson and explained that he (Judge Hammill) was aware of the case, had spoken with the local merchant involved, and if Gibson's client would agree not to sue the merchant, the merchant would drop the shoplifting charges. Judge Hammill also telephoned Gibson's client at home and made the same proposal.

As explained below, we conclude that Judge Hammill's handling of the Ames, O'Donnell, Vespini, Jackson and Gibson matters demonstrates judicial incompetence, a failure to uphold the dignity and decorum of judicial office, and a propensity to diminish public confidence in the judiciary.

First, we find that Judge Hammill has demonstrated a lack of competence in areas of the law that are crucial to the discharge of a magistrate's fundamental duties, and has failed to comprehend and safeguard the basic constitutional rights of our citizens by: (1) ordering Ames to pay a fine without first providing her notice and a hearing, (2) ordering Jackson to pay damages without the benefit of notice and a hearing, and (3) ordering a warrantless search of Vespini's home without first holding an evidentiary hearing to determine whether probable cause existed or whether Vespini was an immediate threat to others. See 18 USC § 922 (g) (8). It is axiomatic that notice and an opportunity to be heard are the cornerstones of the Due Process rights guaranteed by our Federal and Georgia Constitutions. *Hood v. Carsten,* 267 Ga. 579, 580 (481 SE2d 525) (1997). Moreover, it is simple Fourth Amendment hornbook law that no warrant can issue except upon a judge's express finding that probable cause exists to justify the resulting intrusion, unless permitted by specific extenu-

---

[6] The deputy sheriff testified that upon arriving at the Vespini home, Vespini said that he was expecting the deputy sheriff to come and take the weapons.

ating circumstances. See *Espinoza v. State*, 265 Ga. 171, 172 (454 SE2d 765) (1995). These principles are so fundamental to our notions of justice and fair play that they are understood (at least in theory) by the vast majority of our citizenry. Furthermore, they are essential to the proper discharge of a magistrate's fundamental duties, which (at a bare minimum) require judges to determine whether there is probable cause to issue a search warrant, and to protect the due process rights of all litigants. OCGA § 15-10-2.

We conclude that by denying Ames and Jackson their constitutional right to notice and a hearing, and by denying Vespini his constitutional right to be free of unreasonable searches and seizures, Judge Hammill has demonstrated a lack of competence in areas of the law that are essential to the proper discharge of a magistrate's fundamental duties, and has failed to comprehend and safeguard basic precepts of our constitutional structure. In so doing, Judge Hammill not only has demonstrated judicial incompetence, his actions have also diminished public confidence in the judicial office, thereby violating Canons Two and Three of the CJC.

Second, we find that by attempting to serve as a go-between in the state court shoplifting prosecution of Attorney Gibson's client, Judge Hammill acted irresponsibly and contrary to the independent role required of the judiciary. A judge is required at all times to remain impartial and unbiased with regard to court proceedings, and must avoid even the appearance of impropriety in all of his actions. By injecting himself into the proceedings against Attorney Gibson's client, Judge Hammill not only showed very bad judgment, he acted with complete disregard for — and disrespect of — the state court's jurisdiction over the matter. We find it especially troubling that Judge Hammill went so far as to telephone the client at her home and suggest a proposed settlement that involved her relinquishment of the right to seek legal resolution of an improper detainment claim. Judge Hammill's actions in this instance were highly unprofessional, contrary to the judiciary's role in our legal system, and in violation of Canons Two and Three of the CJC.

Finally, Judge Hammill's retaliatory actions against Judge O'Donnell in response to the latter's actions concerning the Ames matter were entirely unbefitting a judge, as was his evasive and belligerent testimony in defense of such actions at the JQC hearing. By this conduct, Judge Hammill violated both Canon Three's requirement that judges maintain decorum and be patient, dignified, and courteous to everyone they deal with in their official capacity, as well as Canon Two's prohibition of any impropriety in a judge's activities.

Therefore, for the reasons discussed above, we conclude that Judge Hammill has demonstrated judicial incompetence, has acted contrary to the independence and integrity expected of a judge, has

failed to uphold the dignity and decorum of judicial office, and has acted in an irresponsible manner that erodes public confidence in the judiciary, in violation of Canons Two and Three of the CJC.

2. Based upon the findings outlined below, we accept the JQC's findings that Judge Hammill has demonstrated a lack of the decorum and temperament required of the judiciary, and has displayed inappropriate judicial behavior, in violation of Canon Three of the CJC.

In March 2001, Judge Hammill issued a "good behavior bond"[7] against a man who had been harassing Angela Rigsby. When Rigsby informed Judge Hammill that the offender had violated the bond, the judge told her to inform law enforcement of the violation herself. When Rigsby's attempt to do so was unsuccessful, she contacted Hammill again. She informed the judge that she was frightened of the offender and wanted him restrained from contacting her. Rigsby testified that in response, Judge Hammill told her not to worry, because "if he [the offender] kills you, we'll get him."

In October 2001, after Judge Hammill's 90-day suspension, he spoke to a young man appearing before him on aggravated stalking charges. Hammill told the young man: "My dad used to say to me when I'd do something stupid, he'd say, 'You got shit for brains. . . .' Did you ever hear that expression?" In his filing with this Court, Judge Hammill concedes that this language was foul and inappropriate and assures us he will not use this type of language again as a judge, but claims that he was simply trying to make his point to the young offender.

Also in October 2001, after Judge Hammill's 90-day suspension, an older African-American man appearing before the judge was found guilty of violating a county ordinance. While discussing the possibility of community service, the man said that his advanced age might prevent him from doing certain kinds of work. Judge Hammill responded by telling the man he would not "be outdoors doing physical labor like picking cotton." When asked about this comment at the JQC hearing, Judge Hammill became irate and said he was insulted by the suggestion that the comment might be construed as racially insensitive.

While we acknowledge Judge Hammill's concession that he used inappropriate language in one of these situations, we nonetheless find that these three incidents, taken together, demonstrate inappropriate judicial behavior and a lack of the decorum and temperament required of members of the judiciary. These incidents also exhibit insensitivity to the vulnerable position in which most litigants find themselves. Criticism, even when it is sharp, is not uncivil in and of

---

[7] See OCGA § 17-6-90 et seq.

itself. However, civility does require judges to treat litigants in a manner that demonstrates a respect for them as human beings. The individuals involved in these incidents were treated uncivilly by Judge Hammill, and we have no doubt that they were left with an unfavorable impression of our judicial system, based solely upon their encounters with Judge Hammill. Accordingly, we conclude that based upon the behavior outlined above, Judge Hammill violated Canon Three of the CJC.

3. For the reasons explained below, we accept the JQC's findings that Judge Hammill has violated Canons One and Two of the CJC by failing to respect and comply with the law. Between February and July 2000, before becoming Chief Magistrate but while sitting as a municipal court judge, Judge Hammill wrote approximately 45 business-related and personal checks that were returned by the bank for insufficient funds. At the JQC hearing, Judge Hammill acknowledged that the checks were returned by his bank to the payees, but declined to acknowledge the seriousness of these incidents. Instead, Judge Hammill sought to excuse the returned checks by explaining that they were written while he was preoccupied with the primary election for the Chief Magistrate position. Judge Hammill also argued that no harm had resulted from the bounced checks, because all of the creditors had been paid promptly after the checks were returned. In his filings with this Court, Judge Hammill argues that because he wrote these checks while sitting as a municipal court judge, his actions were not subject to JQC oversight, even though the CJC's preamble states that it applies to "[a]nyone . . . who is an officer of a judicial system performing judicial functions." Statement of Application of the Code of Judicial Conduct (1994) (emphasis supplied).

It is a misdemeanor in Georgia to write checks without sufficient funds on deposit to honor their payment. OCGA § 16-9-20 (a).[8] Ironically, prosecutions for bad checks are conducted in the magistrate courts of our state. OCGA § 15-10-200 et seq. By issuing numerous checks without sufficient funds on deposit to honor their payment, Judge Hammill violated the prohibition against such conduct, and also acted contrary to the high standards of behavior required of the judiciary, thereby violating Canons One and Two of the CJC.

---

[8] OCGA § 16-9-20 (a) defines "Deposit Account Fraud" as a crime that occurs when a person writes a check for the payment of money in exchange for consideration or services, knowing that the check will not be honored upon presentment. It is prima facie evidence that the person knew the check would not be honored if payment is refused upon presentment and the accused does not tender the amount due to the holder, and pay any service charges owing, within ten days. OCGA § 16-9-20 (a) (2). In the present matter, Judge Hammill testified that he promptly paid the money owed to all payees of his bad checks. It is impossible to tell from the record, however, when exactly those individuals were paid.

This conduct is especially troubling because, as a magistrate judge, Judge Hammill was charged with the duty of adjudicating prosecutions for this same misconduct. Equally troubling is Judge Hammill's cavalier refusal at the JQC hearing to acknowledge the seriousness of the bounced checks. We conclude that Judge Hammill's steadfast unwillingness to accept moral accountability for writing the bad checks demonstrates an irresponsible and presumptuous attitude that is inappropriate for a member of the judiciary, in violation of Canon Two of the CJC.

4. We do not accept the JQC's finding that Judge Hammill improperly practiced law while sitting as a magistrate. Judge Hammill represented Zoret in a dispute with a builder from November 2000, after winning election to the Chief Magistrate position but before being sworn in, until mid-February 2001, when the matter went into arbitration proceedings. Also, at an undetermined time in 2000, Judge Hammill agreed to represent Watson regarding the probate of her mother's estate. On January 24, 2001, during a break from his daily duties as Chief Magistrate, Judge Hammill appeared in the probate court as counsel for Watson. Based on these facts, the JQC found by clear and convincing evidence that Judge Hammill improperly practiced law after being sworn in as Chief Magistrate.

Canon 5 (F) of the CJC states that "Judges shall not practice law, unless allowed by law." OCGA § 15-10-22 (b), in turn, states that "[a] magistrate who is an attorney may practice in other courts, but may not practice in the magistrate's own court or appear in any matter as to which that magistrate has exercised any jurisdiction." Moreover, JQC Advisory Opinion No. 87 states that the CJC "authorizes magistrates to practice law, subject to the limitations [stated in section 15-10-22]." However, JQC Advisory Opinion 87 also states that a magistrate who has made a full-time commitment to his judicial duties "violates Canon 5 (F) by engaging in any effort to practice law which interfere[s] with the proper performance of those duties." Finally, as found by the JQC, the local ordinance creating the position of Glynn County Chief Magistrate states the position is intended to be full-time.

Quite obviously, the foregoing indicates there are ambiguities between the Code, the JQC's advisory opinion, the CJC, and the local legislation. Accordingly, we decline to base our decision to remove Judge Hammill from office on the JQC's finding that he improperly practiced law while sitting as Chief Magistrate.

5. We accept the JQC's finding that there is no clear and convincing evidence that Judge Hammill violated Canon 5 (D) by improperly serving as a guardian after taking office. In October 2000, after winning the local primary but before being elected Chief Magistrate, Judge Hammill became the paid guardian of Kicklighter. He contin-

ued to serve as Kicklighter's guardian while Chief Magistrate and resigned his guardianship in October 2001.

Canon 5 (D) states that judges "should not" serve as guardians except when the guardianship concerns a member of their family and only then when guardian service will not interfere with the performance of judicial duties. The Canon describes "family members" as including persons with whom the judge maintains a close familial relationship. In this matter, the JQC found that Judge Hammill's relationship with Kicklighter was close and familial in nature. The JQC also noted that Canon 5 (D)'s use of the phrase "should not" indicates that the Canon is intended to be advisory in nature, rather than mandatory. For these reasons, the JQC declined to find clear and convincing evidence that Judge Hammill violated Canon 5 (D).

We agree with the JQC for an additional reason. A commentary to the CJC states that:

> If serving as a fiduciary when selected as [a] judge, a new judge may, notwithstanding the prohibitions in [Canon] 5 (D), continue to serve as [a] fiduciary, but only for that period of time necessary to avoid serious adverse consequences to the beneficiary . . . and in no event longer than one year.

Because Judge Hammill resigned as Kicklighter's guardian ten months after assuming the post of Chief Magistrate, we believe that he complied with his duties under Canon 5 (D). Accordingly, we accept the JQC's finding that no clear and convincing evidence exists to show a violation of Canon 5 (D) by Judge Hammill.

6. In sum, because we find by clear and convincing evidence that Magistrate Judge R. Joseph Hammill of the Glynn County Judicial Circuit has demonstrated judicial incompetence, has disregarded the law as applied to his own conduct, has by his actions eroded public trust and confidence in the judiciary, has engaged in behavior that is inappropriate for a sitting judge, and has shown a lack of the requisite judicial decorum and temperament, it is hereby ordered that he be permanently removed from office instanter.

*Removed from office. All the Justices concur, except Carley, J., who dissents.*

DECIDED JULY 2, 2002 —
RECONSIDERATION DENIED JULY 26, 2002.

*Cheryl F. Custer, Keith E. Adams*, for Judicial Qualifications Commission.

*Eugene Highsmith, Richard D. Phillips, Robert F. Pirkle*, for Hammill.