315 Ga. 841
FINAL COPY

S21Z0595.  INQUIRY CONCERNING JUDGE CHRISTIAN
COOMER.

PER CURIAM.

This long-delayed judicial discipline matter comes to us after a
full hearing and the Judicial Qualifications Commission ("JQC")
Hearing Panel's recommendation to remove Judge Christian
Coomer from his seat on the Court of Appeals. We conclude that the
Hearing Panel made at least two critical legal errors that prevent us
from resolving the matter on this record. Accordingly, we remand for
the Hearing Panel to make new findings in the light of the law as it
actually exists, and to do so quickly.

1.     *Introduction.*

In late 2020, the JQC brought formal charges against Judge
Coomer. The charges, as later amended, comprise 36 counts alleging
that Judge Coomer violated three provisions of the Georgia Code of
Judicial Conduct ("the Code"), in several ways. First, he allegedly

violated several Georgia Rules of Professional Conduct in his capacity as a lawyer in dealings with a client including allegations of substantial "dishonesty, deceit, and misrepresentation." Second, he allegedly used campaign funds for impermissible purposes and failed to disclose certain expenditures. And third, he allegedly engaged in several transactions — both campaign-related and personal — in which he declared a "fictitious" transfer to his campaign account and misrepresented his liabilities and assets in a mortgage application. Many of the allegations involved conduct that occurred exclusively before Judge Coomer was a judge or judicial candidate. A few days after formal charges were filed, Judge Coomer was suspended from office pending resolution of this matter.

In 2021, the JQC Hearing Panel rejected Judge Coomer's arguments that the JQC lacked jurisdiction over conduct that occurred before Judge Coomer was a judge or judicial candidate. And in late 2022, nearly two years after the charges had been filed, the JQC finally tried Judge Coomer in a hearing held over a three-month period.

On January 30 of this year, the Hearing Panel submitted its Report and Recommendation to this Court. The Hearing Panel found that the Director failed to prove the counts alleging dishonesty, deceit, misrepresentation, and fictitious transfers. But the Hearing Panel found that the Director proved most of the remaining counts, and that Judge Coomer's violations were committed either knowingly or in ignorance of the law, and that neither option was acceptable. The Hearing Panel recommended that we remove Judge Coomer from office.

In so doing, the JQC — both the Director and the Hearing Panel — made two critical legal errors that prevent us from resolving this matter now. First, both the Director and the Hearing Panel determined that the JQC has "jurisdiction" over conduct that occurs before a person becomes a judge or judicial candidate, and thus could pursue counts against Judge Coomer regarding pre-judicial conduct. That is wrong. The Code of Judicial Conduct plainly applies only to conduct by judges and judicial candidates while they are judges or judicial candidates — indeed, the JQC acknowledged

3

as much in two separate filings with this Court, not long before filing formal charges against Judge Coomer. Inexplicably, however, neither the Director's argument to the Hearing Panel nor the Hearing Panel's conclusion even acknowledges the JQC's previous position; the Director's only acknowledgment of that position came after Judge Coomer raised the issue last week, and still fails to engage with the relevant text. The Code of Judicial Conduct simply has no application to conduct by people who are not yet judges or judicial candidates, even if they later become a judge or judicial candidate.

Second, both the Director and the Hearing Panel failed to understand the circumstances in which the Constitution and our case law permits judicial discipline. Longstanding precedent makes clear that although actions taken in a judicial capacity — acting *as* a judge, not merely *while* a judge — can warrant discipline regardless of good faith, actions taken outside a judicial capacity can warrant discipline only when taken in bad faith. None of the counts against Judge Coomer allege any actions taken in a judicial capacity,

4

and so, in order to prevail on those counts, the Director would need to prove bad faith by clear and convincing evidence. But the Director instead argued that even mere negligence would warrant discipline, without acknowledging our case law to the contrary. And the Hearing Panel accepted that argument, recommending removal based on an apparent assumption that it did not matter whether Judge Coomer violated the law knowingly or in ignorance. But bad faith requires more than ignorance, and because the Hearing Panel's report and recommendation was ambiguous as to whether it found that Judge Coomer acted with bad faith, without clearer findings we cannot determine what, if any, discipline is appropriate.

We are not in a position to make our own findings. The Hearing Panel heard dozens of hours of live testimony — the hearing transcript alone is more than 2,100 pages long — and determining whether violations of the law were knowing and intentional or merely negligent requires careful credibility determinations based on personal observation. Only the Hearing Panel can make such determinations. Accordingly, we remand the matter for the Panel to

do precisely that.

2. *Background.*

Judge Coomer was admitted to the State Bar of Georgia in 1999. After leaving active lawyer duty with the United States Air Force's Judge Advocate General's program in 2005, Judge Coomer started his own private law practice in Cartersville. He also served in the Georgia House of Representatives from 2011 until he joined the Court of Appeals in 2018. He briefly served as a judge on the Municipal Court of Adairsville in 2014. Before his appointment to the Court of Appeals, Judge Coomer formally pursued two other judicial vacancies. He applied for a vacancy on the Court of Appeals on March 29, 2018, withdrawing from consideration the following month. On August 30, 2018, Judge Coomer applied for a vacancy on this Court, but on September 14, 2018, Governor Nathan Deal announced his intention to appoint Judge Coomer to the Georgia Court of Appeals. On October 31, 2018, Governor Deal appointed Judge Coomer to the Court of Appeals and administered the oath of office. Judge Coomer was elected to the Court of Appeals for a full

six-year term in 2020.

Also in 2018, the JQC grappled with the question of how — if at all — the Code of Judicial Conduct applied to conduct by people not yet judges or judicial candidates. As discussed in more detail below in Division 4 (b), in June 2018 the JQC Hearing Panel submitted for this Court's review a formal advisory opinion concluding that the Code of Judicial Conduct's text made clear that it did not apply to conduct by those not yet judges or judicial candidates. Later that year, the JQC Investigative Panel submitted a request that this Court change the Code to apply to such pre-judicial conduct. We did not approve the proposed changes. At some point, the JQC withdrew the formal advisory opinion, a fact we acknowledged by order in September 2020.

On December 28, 2020, the JQC filed formal charges against Judge Coomer, alleging 26 counts of misconduct in violation of the Code. The allegations largely dealt with Judge Coomer's representation of a client, James Filhart, while in private practice, as well as dealings with Filhart after Judge Coomer became a judge

on the Court of Appeals. The formal charges also included allegations regarding Judge Coomer's campaign account and allegations that he made misrepresentations in a March 2020 mortgage application.

The day after formal charges were filed, the Investigative Panel filed a motion to suspend Judge Coomer pending the final resolution of the JQC proceeding under JQC Rule 15 (C). But that rule permits interim suspensions only upon "receipt of sufficient evidence demonstrating that a judge poses a substantial threat of serious harm to the public or to the administration of justice . . . ." The Investigative Panel did not offer any evidence at all, and so we held the motion in abeyance to allow it to submit evidence. We also rejected Judge Coomer's initial attempt to consent to a suspension because he did not admit even conditionally for purposes of a motion to suspend that the standard for suspension had been met; the JQC Rules do not permit a judge to consent to a suspension without satisfying the evidentiary standard of Rule 15 (C). On January 5, 2021, the JQC filed a new motion to suspend, which included

averments that Judge Coomer consented to the motion, agreeing only for purposes of the motion that the JQC could prove the allegations against him, and further agreeing that the allegations in the motion and the formal charges, if taken as true, warranted suspension under the standard set forth in JQC Rule 15 (C). This Court granted this motion, suspending Judge Coomer with pay, per JQC Rule 15 (C) and the Georgia Constitution's requirement that "[a]n incumbent's salary, allowance, or supplement shall not be decreased during the incumbent's term of office." Ga. Const. of 1983, Art. VI, Sec. VII, Par. V; see also generally *DeKalb County School Dist. v. Ga. State Bd. of Ed.*, 294 Ga. 349, 369 (4) (a) (751 SE2d 827) (2013) (state and federal due process rights apply to constitutional officers in context of suspension and removal).

On March 8, 2021, Judge Coomer sought dismissal of the formal charges on the ground that the JQC lacked the power to discipline him for conduct alleged to have occurred before he became a judge or judicial candidate, or for conduct that the State Bar of Georgia or the Georgia Government Transparency and Campaign

9

Finance Commission ("CFC") were investigating. The Hearing Panel denied the motion on December 16, 2021. On January 25, 2022, Judge Coomer filed with this Court a petition for a writ of mandamus, writ of prohibition, and stay of proceedings.[1] The petition asked this Court to prohibit the JQC "from exercising subject matter jurisdiction over allegations of conduct that occurred prior to the time he became a judge and allegations of conduct that occurred prior to the time he became a judicial candidate, mandat[e] that the JQC dismiss and close the ongoing disciplinary inquiry relating to such allegations" against Judge Coomer "as beyond the subject matter jurisdiction granted to the JQC" and "stay . . . the JQC inquiry and proceeding pending the Court's determination of the threshold issue of subject matter jurisdiction." Primarily on procedural grounds, the Director opposed our exercise of jurisdiction over Judge Coomer's petition. On March 8, 2022, this Court

---

[1] That petition was not an appeal from the Hearing Panel's order; at the time, no mechanism for appeal existed. Instead, that petition sought to invoke our rarely-exercised original jurisdiction. On February 3, 2023, a new JQC Rule 25 (B) (4) permitting interlocutory appeals became effective.

dismissed the petition, saying that the petition did not present one of the extremely rare instances that warranted the Court exercising its power to grant original relief. The dismissal order was clear that it expressed no view on the merits of Judge Coomer's arguments and stated that the dismissal was without prejudice to Judge Coomer's right to assert such arguments in any future proceeding in this Court.

Ten days later, the Director filed amended formal charges against Judge Coomer, this time expanding the allegations to include some additional counts related to alleged campaign finance violations arising from trips he took to Israel in 2017 and Hawaii in 2018. All told, the amended formal charges included 36 counts. The JQC charged that Judge Coomer violated three provisions of the Code: Rule 1.1 ("Judges shall respect and comply with the law."); Rule 1.2 (A) ("Judges shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary."); and Rule 4.2 (B) ("Judicial candidates, including incumbent judges, shall not use or permit the

use of campaign contributions for the private benefit of themselves or members of their families.").

A formal hearing on the amended charges was held on October 17-21, November 9, and December 21-22, 2022. On January 30, 2023, the Hearing Panel filed with this Court a Report and Recommendation recommending that Judge Coomer be removed from his position on the Court of Appeals. The Hearing Panel found that the Director had proved all but seven of the counts against Judge Coomer by clear and convincing evidence.[2]

On February 21, 2023, Judge Coomer timely filed a Notice of Exceptions to the Hearing Panel's Report and Recommendation. See JQC Rule 24 (F). Disagreeing with many of the Hearing Panel's factual and legal conclusions, Judge Coomer argues that the Director failed to carry the burden to show by clear and convincing evidence that Judge Coomer should be removed from office. Judge Coomer requests that the Court, if it is inclined to impose any

---

[2] We also note that in addition to rejecting seven counts altogether, the Hearing Panel concluded that the JQC had proved only "half" of one additional count.

discipline here, issue a public reprimand or censure. The Director did not file a notice of exceptions, thereby accepting the findings and conclusions of the Hearing Panel. This matter now comes before us to review the Hearing Panel's Report and Recommendation and determine what discipline, if any, is warranted.

3. *In reviewing a recommendation for judicial discipline, we defer to factual findings unless clearly erroneous, but review legal determinations de novo, and exercise our own discretion in determining what discipline, if any, is warranted.*

We begin by setting out the proper standard of review. The Constitution divides tasks associated with judicial discipline between the JQC and this Court, assigning to the JQC the power to investigate, try, and recommend disciplinary sanctions in judicial misconduct matters, and vesting only this Court with the power to impose disciplinary sanctions. See Ga. Const. of 1983, Art. VI, Sec. VII, Pars. VI (a), VIII; see also *Inquiry Concerning Judge Crawford*, 310 Ga. 403, 407 n.5 (851 SE2d 572) (2020) (Blackwell, J., concurring).

Pursuant to a constitutional amendment approved by Georgia

13

voters in 2016, the governance of the JQC itself has undergone considerable change in recent years. Georgia voters approved the amendment of certain provisions of the Georgia Constitution governing the composition and procedures of the JQC. See Ga. L. 2016, pp. 896-897; Ga. L. 2022, p. 383A. The amendment "abolished" the existing JQC and gave the General Assembly the authority to "create and provide for the composition, manner of appointment, and governance of" the JQC, with appointments to the JQC "subject to confirmation by the Senate as provided for by general law." See Ga. L. 2016, pp. 896-897 (amending Ga. Const. of 1983, Art. VI, Sec. VII, Par. VI (a), (c)). Pursuant to its new authority, the General Assembly passed extensive legislation regarding the composition of the JQC and its procedures. Most notably, the new statutory structure created a bifurcated system where the Investigative Panel and its staff investigates and prosecutes allegations of judicial misconduct and the Hearing Panel adjudicates formal charges and makes recommendations to this Court. See OCGA § 15-1-21 (e). But the constitutional amendment left untouched this Court's

14

constitutional authority over judicial discipline, as well as the constitutionally prescribed circumstances in which judicial discipline may be imposed. In other words, although the General Assembly has exercised its newfound authority to shape the power and procedures of the JQC, such that the way the JQC does its work has changed, the authority of this Court in the system of judicial discipline remains the same, as do the standards for imposing discipline. Accordingly, our pre-2016 case law on these points remains "binding." See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI.

In considering whether the Director has met the standard of proof as to charges of misconduct, we employ a "clear and convincing proof standard." See *Inquiry Concerning Judge Crawford*, 310 Ga. at 405 (2). Pursuant to its constitutional obligation to review any proposed removal of a judge, this Court "exercise[s] its judgment based upon the entire record in order to determine whether [the] conduct [of a judge or judicial candidate] warrants discipline, and, if so, what sanctions should be imposed." *In the Matter of: Inquiry Concerning a Judge*, 275 Ga. 404, 406 (566 SE2d 310) (2002)

15

(citation and punctuation omitted). "In performing this independent function, we give substantial consideration and due deference to the [Hearing Panel's] ability to evaluate the credibility of the witnesses who appear before it. However, this Court reaches its own conclusions regarding disciplinary sanctions against a sitting judge, and the recommendations of the [Hearing Panel] are not binding upon us." Id. Again, because the recent constitutional overhaul of the JQC did not alter this Court's authority over the disciplinary process, this standard remains the same.

We therefore apply the sort of review this Court generally applies to review of a factfinder who also draws legal conclusions and makes determinations as to an appropriate outcome, i.e., deferring to credibility determinations and factual findings unless clearly erroneous, and reviewing legal determinations and the ultimate outcome de novo. See *Inquiry Concerning a Judge*, 275 Ga. at 406; see also, e.g., *Nelson v. State*, 312 Ga. 375, 377 (863 SE2d 61) (2021) (standard for reviewing a trial court's ruling on a defendant's motion to suppress); *In the Matter of Cook*, 311 Ga. 206, 207-208 (1)

16

(857 SE2d 212) (2021) (standard of review for State Bar disciplinary matters); OCGA § 24-6-620 (Evidence Code provides that "[t]he credibility of a witness shall be a matter to be determined by the trier of fact[.]").

4. *The Hearing Panel misapprehended the scope of the Code of Judicial Conduct by applying it to actions by Judge Coomer before he became a judicial candidate.*

Although we have endeavored to apply this standard of review here, we are constrained by the two major flaws in the Hearing Panel's Report and Recommendation. We start by considering the first of these flaws: the Hearing Panel based its recommendation at least in part on conduct that occurred before Judge Coomer became a judge and outside of the time that he was seeking a judgeship. But that is incorrect; the Code of Judicial Conduct does not apply to such pre-judicial conduct.

Judge Coomer has argued throughout these proceedings that he cannot be disciplined for pre-judicial conduct. He has contested the JQC's ability to seek discipline of him for conduct that occurred before he offered himself for consideration for a judgeship, framing

17

this as a question of the JQC's "jurisdiction." Prior to conducting the formal evidentiary hearing in this matter, the Hearing Panel rejected these arguments, relying primarily on the JQC Rules and the Georgia Constitution to conclude that the JQC in fact has "jurisdiction" over pre-judicial conduct to the extent that conduct is "prejudicial to the administration of justice which brings the judicial office into disrepute."

We agree with Judge Coomer that the JQC cannot pursue charges against him arising from actions taken before he became a judge or judicial candidate. But instead of this being a question of the JQC's jurisdiction or constitutional power, this conclusion is instead the result of the plain text of the Code of Judicial Conduct, which does not apply to actions taken by people who are not yet judges or judicial candidates.

(a) *We need not resolve Judge Coomer's argument that due process forecloses discipline based on pre-judicial conduct.*

Judge Coomer has argued that imposing discipline for conduct prior to his time as a judge or judicial candidate would violate his

18

due process rights because he had no notice at the time he engaged in the alleged conduct that it would be subject to the Code. In its order denying the motion to dismiss, the Hearing Panel rejected that argument, reasoning that the judicial discipline process is not about punishing a judge, but determining his fitness to serve. The Panel cited language from a 1995 decision of this Court that "the removal of a judge is not designed to punish the individual, but rather is the legal consequence of judicial misconduct or unfitness." In the *Matter of: Inquiry Concerning a Judge*, 265 Ga. 843, 848 (4) (462 SE2d 728) (1995). The Panel added that Judge Coomer

> knew or should have known when repeatedly applying for and ultimately attaining his position as a judge that the JQC Rules expressly provide the JQC with jurisdiction over his pre-judicial conduct and that such conduct may well bear upon his capacity to perform his duties with integrity, impartiality, and competence, as well as relate to the public's confidence in the judiciary.

The Hearing Panel gave insufficient consideration to Judge Coomer's due process argument. The Georgia Constitution explicitly provides that "[n]o action shall be taken against a judge except after

19

hearing and in accordance with due process of law." Ga. Const. of 1983, Art. VI, Sec. VII, Par. VIII. Based on this provision, this Court has said the JQC's authority to enforce the Code "is not . . . unlimited, inasmuch as the Constitution requires the Commission to afford due process to judges and provides for this Court to review the imposition of discipline." *In re Judicial Qualifications Comm'n Formal Advisory Opinion No. 239*, 300 Ga. 291, 294 (1) (b) n.6 (794 SE2d 631) (2016). Indeed, this Court relied on precisely this constitutional provision in the very same decision the Hearing Panel cited in its order denying Judge Coomer's motion to dismiss: we said "[t]he gravity of the [judicial discipline] proceeding requires that it be fundamentally fair and in keeping with the basic requirements of due process." *Matter of Inquiry Concerning a Judge*, 265 Ga. at 848 (4).[3]

---

[3] Federal due process requirements also apply. See *S&S Towing & Recovery, Ltd. v. Charnota*, 309 Ga. 117, 119 (1) (844 SE2d 730) (2020) (Principles of due process embodied in the Fourteenth Amendment "extend to every proceeding, whether judicial or administrative or executive in its nature, at which a party may be deprived of life, liberty, or property." (citation and punctuation omitted)); *Collins v. Morris*, 263 Ga. 734, 735-736 (1) (438 SE2d

But we need not resolve here whether disciplining a judge for actions committed prior to him becoming a judge or judicial candidate would violate that judge's due process rights. Regardless of whether due process would place such a limit on the JQC's power, the JQC can investigate and try only violations of the Code of Judicial Conduct. And the Code of Judicial Conduct does not extend to pre-judicial conduct.[4]

(b)     *The text of the Code of Judicial Conduct makes clear that it does not reach conduct of those who are neither judges nor judicial candidates.*

"[T]he authority to prescribe . . . particularized standards for judicial conduct belongs to this Court as an incident of the judicial power, an authority that we have exercised by our adoption of the Code of Judicial Conduct." *In re Judicial Qualifications Comm'n*

---

896) (1994) (elected officials have a property interest in their office that can be taken from them "only by procedures meeting the requirements of due process") (quoting *City of Ludowici v. Stapleton*, 258 Ga. 868, 869 (1) (375 SE2d 855) (1989)). And fair notice of what conduct is prohibited is a key component of due process. See *Baker v. State*, 280 Ga. 822, 823 (2) (633 SE2d 541) (2006).

[4] To be clear, we are not talking about situations in which a judge is *indicted* or *convicted* for conduct occurring before the judge became a judge. Specific procedures in that event are set forth in Article VI, Section VII, Paragraph VII, subsections (b) and (c) of the Georgia Constitution.

*Formal Advisory Opinion No. 239*, 300 Ga. at 294-295 (1) (b) (citation and footnote omitted). The Code repeatedly makes clear that it governs the conduct of only judges and "judicial candidates," a defined term that includes persons applying for judicial appointments, as well as elected candidates and announced appointees waiting to be sworn in.[5] The Preamble to the Code states that the Code "establishes standards for ethical conduct of judges and judicial candidates." Language in the Code outlining its "[s]cope" specifies that its canons and rules "are intended to govern conduct of judges and judicial candidates, and in certain circumstances to be binding upon them." Code, Scope [6]. And in another introductory section outlining the "[a]pplication" of the Code, the Code says that "[a]ll judges, whether full-time, part-time,

---

[5] A change to the rules clarifying that "[a] person who is announced as the appointee to fill a judicial position by the Governor . . . continues to be a judicial candidate until he or she is sworn into office" did not take effect until November 1, 2018. But the earlier version of the rules nonetheless led to the same result here. After all, the Code unambiguously applied to judicial candidates, and a candidate for appointment remains a candidate until actually appointed. Merely being announced as the intended appointee is not the same as an actual appointment; Judge Coomer did not cease being a candidate for appointment until his appointment was signed, which happened the same day he was sworn in, October 31, 2018.

22

or pro tempore, shall comply with this Code" except as otherwise provided. That overarching declaration regarding the breadth of the Code's application specifies that "[a]nyone, whether or not a lawyer, who performs judicial functions under the Constitution and laws of Georgia, including an associate judge, senior judge, special master, magistrate, or municipal judge, or any person who is a judicial candidate for any such office, is a judge for the purpose of this Code." Code, Application.

This reading of the plain language of the Code as governing the conduct of only judges and judicial candidates is bolstered by the fact that even for a person clearly governed by the Code, some of its provisions do not apply, or do not apply immediately upon that person coming within the Code's reach. Part-time judges and judges pro tempore are permitted to engage in the private practice of law, and thus are not required to comply with certain rules in certain contexts. See Code, Application (A)-(B). In defining the term "judicial candidate," the Code provides that "[j]udicial candidates who do not currently hold judicial office are subject to the same Code

provisions as judges pro tempore." Code, Terminology.[6] The Code also provides that certain rules, like those governing fiduciary activities and personal and family financial activities, must be complied with only "as soon as reasonably possible and . . . in any event within the period of one year from commencing service as a judge." Code, Application (C). All this makes clear that the rules do not govern conduct occurring prior to becoming a judge or judicial candidate, as they do not in every event apply even to new judges.

In context, it is clear that this language means not just that the Code governs only judges and judicial candidates, but also that it governs only those actions taken *while* a person is a judge or judicial candidate. The above-cited provision about the obligations of new judges makes this particularly clear. It says "[a] person to whom this Code becomes applicable" — i.e., someone who becomes a judge or judicial candidate — "shall comply immediately" with most of the rules, but allows a grace period for complying with certain other

---

[6] This language was added to the Code effective November 1, 2018, the day after Judge Coomer was sworn in as a Court of Appeals judge.

rules. Code, Application (C). The necessary implication of that language is that the Code does not require someone to "comply" with any of its rules before they become a judge or judicial candidate. If it did, there would be no need to specify when a person must start complying because all of the person's conduct would be retroactively swept into the Code's reach upon that person becoming a judge or judicial candidate. And in addressing the Code's reach after a person has left judicial office, the Code provides that

> the appropriate authority for judicial discipline shall have continuing jurisdiction over individuals to whom this Code is applicable regarding allegations of misconduct occurring *during* the individual's service as a judge, judicial candidate, or an officer of a judicial system, if a complaint is filed no later than one year following that service.

Code, Application (D) (emphasis supplied). This, too, leads to a conclusion that when the Code says its canons and rules "are intended to govern conduct of judges and judicial candidates," Code, Scope [6], it is referring to conduct undertaken *while* someone is a judge or a judicial candidate.

Moreover, the JQC previously articulated that understanding.

25

At some point prior to March 2018, the Investigative Panel recommended pursuant to JQC Rule 28 (B) that the Hearing Panel issue an opinion on whether the Code of Judicial Conduct applied to conduct by a non-judge before that person becomes a judicial candidate. In June 2018, the Hearing Panel submitted to this Court for approval a Formal Advisory Opinion to the effect that "conduct by a non-judge before that person becomes a judicial candidate . . . is not governed by the Code."[7] See Case No. S18Z1356, *In re JQC Formal Advisory Opinion No. 242*. Reviewing some of the same language from the Code set forth above, the Hearing Panel's proposed FAO concluded:

> What . . . the Code makes clear is that someone who is not yet a judicial candidate — and not already a judge — is not governed by the provisions of the Code. Consequently, the Investigative Panel is without jurisdiction to consider complaints that are limited to allegations of misconduct that occurred *before* a non-judge becomes a judicial candidate. While such allegations may well be fodder for campaign material, they do not fall within the Commission's purview.

Later in 2018, the Investigative Panel proposed various

---

[7] Attached as Appendix 1.

26

amendments to the Code and the JQC Rules, again appearing to recognize that the Code itself did not reach misconduct occurring before a person becomes a judge or judicial candidate.[8] Among the Investigative Panel's proposals were requests that the language about the JQC's ongoing reach after a person left judicial office be amended to the effect that the Code is applicable to "allegations that the individual engaged in conduct prior to service as a judge that impairs the individual's current ability to carry out judicial responsibilities with integrity, impartiality, and competence[.]" The Investigative Panel also proposed adding commentary to Rule 1.2 of the Code that "[o]n rare occasions, violations of the Code may be based on conduct occurring before the individual became a judge." In proposing these amendments, the Investigative Panel explained that the Code and JQC Rules "are at odds regarding jurisdiction over misconduct that occurs before an individual becomes a judge or judicial candidate." The Investigative Panel said the proposed amendments would "clarif[y] what type of conduct — prior to a judge

_____

[8] Attached as Appendix 2.

assuming the bench — the Commission may look to as a potential violation of the Code" and differentiate between the prior misconduct of judges and the prior misconduct by a judicial candidate who never becomes a judge.

But the Court did *not* approve those proposed amendments to the Code. The Court did approve some of the other revisions to the Code requested by the Investigative Panel in that memo, specifically clarifying that announced appointees or election winners awaiting swearing-in are considered "judicial candidates" and that judicial candidates are subject to the same Code provisions as judges pro tempore. But none of those approved amendments extended the Code's reach to conduct occurring before the individual became a judge. Even so, the JQC ultimately withdrew the proposed FAO.[9]

---

[9] We note that, after filing his exceptions to the Hearing Panel's Report and Recommendation, Judge Coomer filed a supplemental brief raising for the first time the FAO and asking us to treat it as persuasive authority. We were already aware of the FAO, and afford it only the treatment reflected in this opinion. In response to Judge Coomer's supplemental brief raising the FAO, the JQC submitted a filing stating that although it does not know exactly when the FAO was withdrawn, records indicate the JQC withdrew it before January 1, 2019. We note that the JQC Rules do not appear to authorize the JQC unilaterally to withdraw a formal advisory opinion once the process for review

28

The JQC takes the position that the FAO became "moot" due to amendments to the Code and JQC Rules approved by this Court on November 1, 2018. But an amendment to the JQC Rules cannot alter the application of the Code itself. And the November 2018 amendments to the Code — which clarified the definition of the term "judicial candidate" and specified that judicial candidates who do not hold judicial office are subject to the same Code provisions as judges pro tempore — in no way undermined the FAO's conclusion that the Code does not apply to pre-judicial conduct.

In summary, the Hearing Panel determined that the Code of Judicial Conduct did not apply to persons not yet judges or judicial candidates, and the Investigative Panel asked this Court to change the Code to make it apply to pre-judicial conduct. This Court

by this Court has been completed, see JQC Rule 28 (B), so its purported unilateral withdrawal may have been ineffective until this Court's September 2020 order reflecting that the FAO was "withdrawn as moot[.]" And the rules do provide that when this Court declines to review a formal advisory opinion, it becomes "binding . . . on the Commission and the person who requested the opinion[.]" JQC Rule 28 (B) (4). Regarding the FAO at issue here, it is the JQC's Investigative Panel that requested the opinion — indicating that the position taken in the opinion became binding on the JQC generally and the Investigative Panel specifically. To be clear, none of our analysis today depends in any way on whatever effect the FAO might have had.

declined. And instead of accepting that fact, the JQC's response was apparently to withdraw the Hearing Panel's determination and proceed as if it had never happened, which ultimately resulted in bringing charges against Judge Coomer based on actions he took before he became a judicial candidate. When Judge Coomer protested by filing a motion to dismiss, the Hearing Panel denied the motion in an order that did not so much as grapple with the text of the Code — let alone acknowledge or explain the JQC's shifting interpretation. Rather, the Hearing Panel relied on the JQC's own Rules, which say that the JQC "has jurisdiction over judges regarding allegations that misconduct occurred *before* or during service as a judge and regarding allegations of incapacity during service as a judge." JQC Rule 2 (B) (1) (emphasis supplied). The Hearing Panel concluded that this JQC Rule "comports with the Georgia Constitution" and is supported by "[t]he fundamental objectives of judicial disciplinary proceedings[.]"

Relying on the constitutional provision that "[a]ny judge may be . . . disciplined . . . for conduct prejudicial to the administration of

justice which brings the judicial office into disrepute," the Hearing Panel concluded that "[t]he Georgia Constitution thus affords the JQC jurisdiction over a judge's pre-judicial conduct to the extent such conduct is 'prejudicial to the administration of justice which brings the judicial office into disrepute.'" But the question of whether the JQC's authority to investigate, try, and recommend disciplinary sanctions based on pre-judicial conduct is constrained by the text of the Constitution does not arise here, and we express no opinion on it. The JQC Rules are procedural rules and rules for the JQC's governance; they do not — and cannot — say what conduct is actually proscribed, and for whom.[10] The Code of Judicial Conduct

---

[10] The statute regarding JQC Rules states that they shall be promulgated by the JQC's Investigative Panel and effective only upon review and adoption by this Court. See OCGA § 15-1-21 (j). This Court has previously said that the authority for JQC rule promulgation is found in a provision of the Constitution unchanged by recent amendments, Article VI, Section VII, Paragraph VII (a), which says this Court "shall adopt rules of implementation" without any requirement for JQC involvement. See *In re Judicial Qualifications Comm'n Formal Advisory Opinion No. 239*, 300 Ga. at 295 (1) (b) n.9. Whether that constitutional construction is correct (which would raise constitutional questions about the statutory requirement for JQC promulgation of such rules), or whether the constitutional language is more properly understood to refer to this Court's authority to promulgate the Code of Judicial Conduct (which we have elsewhere said is not a function of any particular constitutional

31

does that, and this Court alone has the power to promulgate the Code. See *In re Judicial Qualifications Comm'n Formal Advisory Opinion No. 239*, 300 Ga. at 294 (1) (b); *Judicial Qualifications Comm'n v. Lowenstein*, 252 Ga. 432, 433-434 (1) (314 SE2d 107) (1984). So to say that the JQC has "jurisdiction over a judge's pre-judicial conduct" — even if true as a matter of Georgia constitutional law, which we do not decide — is like saying that the superior courts of this state "have exclusive jurisdiction over trials in felony cases." The latter statement is, of course, absolutely true. See Ga. Const. of 1983, Art. VI, Sec. IV, Par. I. But that does not answer the question of what constitutes a "felony" that can be tried in superior court.

---

text, but is instead an inherent power of this Court, see *Judicial Qualifications Comm'n v. Lowenstein*, 252 Ga. 432, 433-434 (1) (314 SE2d 107) (1984)), is not an issue we need decide today. What is clear from the pertinent statute is that the rules shall be "for the commission's governance." OCGA § 15-1-21 (j). The Constitution empowers the General Assembly to legislate on that subject in similar text: "The General Assembly shall by general law create and provide for the composition, manner of appointment, and governance of a Judicial Qualifications Commission . . . ." Ga. Const. of 1983, Art. VI, Sec. VII, Par. VI (a). Neither the statute nor the Constitution supports the idea that the JQC Rules can do more than govern the JQC's own internal practices and proceedings before the JQC. Accord Ga. Const. of 1983, Art. VI, Sec. VII, Par. VI (b) ("The procedures of the Judicial Qualifications Commission shall comport with due process.").

Only Georgia criminal statutes answer that question. Here, by analogy, only the Code answers the question of whether conduct before a person became a judge or judicial candidate may subject that person to judicial discipline under the authority of this Court and the JQC. And, as explained above, the Code plainly answers that question in the negative.

5. *We reject Judge Coomer's other arguments as to the JQC's authority over his conduct even after he became a judicial candidate.*

(a) *The Code of Judicial Conduct's application to judicial candidates extends beyond their activity in "campaigning and politics relating to judicial positions."*

To be clear, we would not go as far as Judge Coomer urges in drawing the limits of the JQC's reach. Judge Coomer argues that the reach of the Code to "judicial candidates" is quite limited. He has argued that "whereas the JQC has jurisdiction over judicial candidates, it is confined to their activity in campaigning and politics relating to judicial positions." But this finds no support in the text of the Code, which, again, specifies that "[a]nyone . . . who performs judicial functions under the Constitution and laws of

33

Georgia, including . . . *any person who is a judicial candidate for any such office, is a judge* for purposes of this Code." Code, Application (emphasis supplied). This language was cabined somewhat in an amendment to the definition of "judicial candidate" in the Code, effective November 1, 2018, specifying that judicial candidates who do not yet hold judicial office are subject only to the more limited constraints on judges pro tempore. But this language was not effective until the day after Judge Coomer was formally appointed and sworn in and thus ceased to be a "judicial candidate." Therefore, during the time that Judge Coomer was a judicial candidate, the general language that "any person who is a candidate" for a judicial office "is a judge" for purposes of the Code controlled. And even under the more limited definition of "judicial candidate" in the current Code, a judicial candidate is not exempt from any of the provisions of the Code at issue in this matter — Rules 1.1, 1.2 (A), and 4.2 (B). Rather, judicial candidates are now exempt only from Rules 3.4 (extra-judicial appointments), 3.8 (fiduciary activities), 3.9 (arbitration and mediation), 3.10 (practice of law), 3.11 (financial

34

activities), and 3.15 (A) (1) (annual financial reporting of extra-judicial compensation). See Code, Application (B) (1). In short, when Rule 1.1 provides that, "*Judges* shall respect and comply with the law," and Rule 1.2 (A) provides that, "*Judges* shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary," "Judges" is understood to include "judicial candidates" — and it was so understood when Judge Coomer was seeking appointments in 2018.

(b)    *Investigating a judge for conduct that occurred while he was simultaneously a judicial candidate and a member of the General Assembly does not violate constitutional separation of powers principles.*

Judge Coomer also argues that investigating him for conduct that occurred while he was a judicial candidate but also still a member of the General Assembly would violate separation of powers principles, because the General Assembly has the authority to regulate the conduct of its members. The Georgia Constitution is "clear that one branch cannot subsume another's territory: 'The legislative, judicial, and executive powers shall forever remain

35

separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided.'" *Ga. Dept. of Human Svcs. v. Steiner*, 303 Ga. 890, 904 (V) (815 SE2d 883) (2018) (quoting Ga. Const. of 1983, Art. I, Sec. II, Par. III). And Judge Coomer cites the Georgia Constitution's direction that each house of the General Assembly "shall be the judge of the election, returns, and qualifications of its members and shall have power to punish them for disorderly behavior or misconduct by censure, fine, imprisonment, or expulsion[.]" Ga. Const. of 1983, Art. III, Sec. IV, Par. VII. But by its own terms, this language does not give the General Assembly *exclusive* power to discipline its members; indeed, that notion would suggest that the members of the General Assembly are immune from criminal prosecution for all crimes at all times, not merely the misdemeanor-arrests-during-session from which the Georgia Constitution protects them. See Ga. Const. of 1983, Art. III, Sec. IV, Par. IX ("The members of both houses shall be free from arrest during sessions of the General Assembly, or committee meetings

36

thereof, and in going thereto or returning therefrom, except for treason, felony, or breach of the peace."). In any event, the JQC's investigation here does not interfere with or subsume the legislative branch's authority. It certainly did not involve the investigation of a sitting legislator and thus in no way interfered with the General Assembly's ability to discipline its members. And at the time the JQC initiated its investigation, Judge Coomer was no longer a member of the General Assembly and was instead a sitting judge.

The Constitution sets forth in general terms the conduct for which a judge may be disciplined, and the Code sets forth the particularized standards. As we make abundantly clear today, the Code, by its terms, applies to judges and judicial candidates. So once Judge Coomer became a judicial candidate, he was required to abide by that Code, even if he was also a legislator for some portion of that time. This does not violate separation of powers principles.

(c) *The JQC's authority includes conduct by judges and judicial candidates that may also fall within the purview of another government agency.*

There is also no merit to Judge Coomer's argument that the

37

JQC lacks authority to discipline Judge Coomer for actions as a judge or judicial candidate merely because another government agency, whether it be the State Bar of Georgia (as an arm of this Court) or the CFC, has concurrent authority to investigate alleged misconduct. An attorney who becomes a judicial candidate may continue to practice law during his candidacy. See Code, "Terminology" — "Judicial candidate"; Application, Part B, cmt. 2. But seeking a judicial office does not absolve that attorney from his obligations under the Georgia Rules of Professional Conduct. Similarly, as Judge Coomer concedes, the CFC is charged with ensuring compliance with campaign finance requirements applicable to all constitutional offices, including judicial ones. See OCGA §§ 21-5-6 (b) (prescribing duties of CFC, including duties to investigate financial disclosure reports), 21-5-50 (generally prescribing duties of public officers and candidates for elected public office to file financial disclosures). Nothing about this statutory scheme strips the JQC of its constitutional authority to investigate judges for misconduct, including for actions taken as a judicial

38

candidate. Judges and judicial candidates must respect and comply with the law, including that governing campaign finance. See Code, Rule 1.1.

Judge Coomer also argues that these proceedings should have been stayed as a prudential matter while the investigations by the CFC and State Bar were pending. There may be circumstances in which the JQC might consider such abstention appropriate, and we do not suggest that it lacks that discretion. But it did not choose to abstain in this matter, and Judge Coomer offers no reason for us to second-guess the JQC's choice, much less substitute our own judgment at this late date. Indeed, given that Judge Coomer's interim suspension with pay has remained in place for more than two years pending a final resolution of the JQC proceedings, prudence counsels resolving this matter with alacrity and dispatch.

6. *The Hearing Panel applied the wrong standard for determining whether a judge may be disciplined under our Constitution.*

We turn now from the scope of the Code of Judicial Conduct to the grounds for discipline authorized by the Constitution. As we

alluded to above, the Georgia Constitution sets out five grounds for discipline: discipline "for willful misconduct in office, or for willful and persistent failure to perform the duties of office, or for habitual intemperance, or for conviction of a crime involving moral turpitude, or for conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. Const. Art. VI, Sec. VII, Par. VII (a).[11] The Amended Formal Charges alleged that discipline

---

[11] This constitutional provision did not include "conviction for a crime involving moral turpitude" among the bases for discipline of judges until the 1983 Constitution. See Ga. Const. of 1976, Art. VI, Sec. XIII, Par. III (b); Ga. L. 1982, pp. 2551, 2553, § 3; Ga. L. 1983, p. 2070. Interestingly, the official committee to revise Article VI at the 1983 Constitutional Convention recommended that the phrase "conduct prejudicial to the administration of justice which brings the judicial office into disrepute" be removed from the provision, suggesting the substitution of "conviction of a crime involving moral turpitude" as more definite language. See Committee to Revise Article VI, Full Committee Meeting, August 8, 1980, at pp. 213-216; Full Committee Meeting, August 22, 1980, at pp. 89-91. Although that version lacking the "conduct prejudicial" clause initially was approved by the General Assembly, see Ga. L. 1981 (Extraordinary Session), pp. 143, 182-183, the version ultimately submitted to, and approved by, Georgia voters, included both phrases. See Ga. L. 1982, pp. 2551, 2553, § 3; Ga. L. 1983, p. 2070.

The 1945 Constitution does not appear to have initially provided for discipline of judges at all. See generally Ga. Const. of 1945, Article VI. But a 1972 amendment to that Constitution created the JQC, with authority to investigate complaints about judges' "willful misconduct in office, or willful and persistent failure to perform his duties, or habitual intemperance; or for conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ga. L. 1972, pp. 1364-1367, Ga. L. 1973, p. 1755; see also *Fortson v. Weeks*, 232 Ga. 472, 490-491 (208 SE2d 68) (1974) (Hall, J., concurring).

was appropriate under only two of these categories, asserting generally that Judge Coomer's conduct constitutes "willful misconduct in office and is prejudicial to the administration of justice, bringing the office of Judge on the Georgia Court of Appeals into disrepute." In recommending that Judge Coomer be removed from office, the Hearing Panel concluded that Judge Coomer had engaged in willful misconduct in office by conduct charged in a handful of counts alleging conduct that occurred while Judge Coomer was a judge, albeit not actions taken in a judicial capacity. And it found that Judge Coomer had engaged in conduct prejudicial to the administration of justice in conduct charged under *all* of the counts that the Hearing Panel found had been proved.

While "willful misconduct in office" and "conduct prejudicial to the administration of justice" may seem very broad, our case law shows otherwise. As one might imagine with legal text of such age and significance, we have explained what those grounds mean:

> We interpret "willful misconduct in office" to mean actions taken in bad faith by the judge acting in her judicial capacity. "Conduct prejudicial to the administration of

41

justice" refers to inappropriate actions taken in good faith by the judge acting in her judicial capacity, but which may appear to be unjudicial and harmful to the public's esteem of the judiciary. Prejudicial conduct may also refer to actions taken in bad faith by a judge acting outside her judicial capacity.

*Matter of Inquiry Concerning a Judge No. 94-70*, 265 Ga. 326, 327-328 (1) (454 SE2d 780) (1995); see also, e.g., *In re Judicial Qualifications Comm'n Formal Advisory Opinion No. 239*, 300 Ga. at 297 (2) (citing *Matter of Inquiry Concerning a Judge No. 94-70* for the proposition that "[a] knowing and willful misapplication of the law . . . would amount to bad faith and thereby implicate the Code of Judicial Conduct"); *Leitch v. Fleming*, 291 Ga. 669, 674 (3) (732 SE2d 401) (2012) (citing *Matter of Inquiry Concerning a Judge No. 94-70* for the proposition that willful misconduct means actions taken in bad faith by a judge acting in her judicial capacity); *In the Matter of: Inquiry Concerning Judge Robertson*, 277 Ga. 831, 834 (3) (596 SE2d 2) (2004) ("Prejudicial conduct refers to actions taken in bad faith by a judge acting outside of his or her judicial capacity. Whether discipline should be imposed and the severity of discipline depends, in part, upon the effect of the improper activity on the

42

judicial system."); *Matter of Inquiry Concerning a Judge*, 265 Ga. at 849 (5) (citing *Matter of Inquiry Concerning a Judge No. 94-70* for the proposition that "blatant disregard for the law" is bad faith).[12]

In other words, "willful misconduct in office" applies only to actions taken in bad faith *and* in a judicial capacity. And "judicial capacity" is a familiar phrase that means actions taken not merely during the term of service as a judge, but actions taken actually as

---

[12] Judge Coomer's counsel appeared to suggest to the Hearing Panel that Paragraph VII (a) of Article VI, Section VII was amended in 2016. But the 2016 amendments did not alter Section VII, Paragraph VII, subparagraph (a) of Article VI, setting forth the grounds on which judges may be removed or otherwise disciplined. See Ga. L. 2016, p. 896, § 2. The language that now comprises subparagraph (a) has not been altered since voters approved the 1983 Constitution.

We also note that the case interpreting this language did so in the context of analyzing language in a JQC Rule. See *Matter of Inquiry Concerning a Judge No. 94-70*, 265 Ga. at 327 (1). Both then and now, the JQC Rules included a rule itemizing the permissible grounds for discipline. Those grounds as they appear in the various rules were and are materially identical to the constitutional language. Compare JQC Rule 6 (A) (providing that "the grounds for discipline are: (1) willful misconduct in office; (2) willful and persistent failure to perform the duties of office; (3) habitual intemperance; (4) conviction of a crime involving moral turpitude; and (5) conduct prejudicial to the administration of justice which brings the judicial office into disrepute"); with former JQC Rule 4 (b) (providing for discipline where judge engaged in "willful misconduct in office, or willful and persistent failure to perform the duties of a judge, or habitual intemperance, or conduct prejudicial to the administration of justice which brings the judicial office into disrepute").

a judge exercising judicial power. See, e.g., *Heiskell v. Roberts*, 295 Ga. 795, 800-801 (3) (764 SE2d 368) (2014) ("Judges are 'immune from liability in civil actions for acts performed in their judicial capacity.'") (quoting *Earl v. Mills*, 275 Ga. 503, 504 (570 SE2d 282) (2002)); compare *Heiskell*, 295 Ga. at 801 ("a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity") (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (112 SCt 286, 116 LE2d 9) (1991) (punctuation omitted)).

None of the counts against Judge Coomer allege anything about actions he took in a judicial capacity. Accordingly, none of those counts permit discipline on the ground that his conduct amounted to "willful misconduct in office." And none of those counts would permit discipline for "conduct prejudicial to the administration of justice," absent a finding of bad faith.

The only cited constitutional basis for discipline that might apply here is the sub-category of "conduct prejudicial to the administration of justice," to the extent that it involves "actions taken in bad faith by a judge acting outside [his] judicial capacity."

*Matter of Inquiry Concerning a Judge No. 94-70*, 265 Ga. at 328 (1).
And plainly, to qualify as "actions taken in bad faith," an action must involve something more than negligence. See *State v. Bryant*, 307 Ga. 850, 854 (2) (838 SE2d 855) (2020) ("Inherent in the concept of bad faith is something more than negligence."); see also *Greenway v. Hamilton*, 280 Ga. 652, 655 (3) (631 SE2d 689) (2006) (noting in attorney fee context that "[b]ad faith is not simply bad judgment or negligence, but a breach of known duty through some motive of interest or ill will" (citation and punctuation omitted)); see also *Wachovia Bank of Ga., N.A. v. Namik*, 275 Ga. App. 229, 234 (3) (b) (620 SE2d 470) (2005) ("Bad faith is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will." (punctuation and footnote omitted)).

The Hearing Panel's Report and Recommendation is ambiguous as to whether the Panel found that Judge Coomer had acted in bad faith in committing any of the proved violations. The

Director argued in closing that, "at a minimum, [Judge Coomer] is so negligent in knowing the law" that the public cannot trust him to sit on the Court of Appeals. The Hearing Panel apparently was persuaded by this argument, offering an explanation for its recommendation of removal that contemplated that Judge Coomer's ignorance of that law may itself be a basis to remove him:

> [Judge Coomer]'s long and unbroken pattern of violating multiple attorney ethics rules and campaign finance laws to his own financial benefit not only erodes the public's confidence in the judiciary, but, just as importantly, falls far short of the high standards of behavior justifiably expected of all judges. [Judge Coomer] either knowingly violated these rules and laws — and didn't care — or he lacked basic knowledge of the ethical and professional responsibilities of his important position as attorney, counselor, and, ultimately, judge. Neither option — violator or uninformed — is acceptable[,] and neither instills confidence in the judiciary. And in this case, there are too many examples of both.

As to Judge Coomer's dealings with Filhart, the Hearing Panel found that Judge Coomer's "conduct establishes a plain pattern of flouting (or not knowing) the law[.]" As to the campaign finance counts, the Hearing Panel concluded that "[a]gain and again, pre-judgeship and after taking the bench, [Judge Coomer] has ignored

(or been ignorant of) critical legal and ethical restrictions on the use of campaign funds." The Hearing Panel concluded generally that parties and their lawyers appearing before Judge Coomer at the Court of Appeals "would have little reason to be confident in [Judge Coomer]'s ability to fairly and competently interpret and apply the law" in various areas of the law that have arisen in these proceedings. These conclusions suggest that the Hearing Panel recommended removal despite leaving open the possibility that Judge Coomer may have simply been ignorant of the rules and laws that the Hearing Panel found he violated — in other words, without finding that the relevant actions were taken in bad faith.

If this were the full extent of the Hearing Panel's conclusions, we might be compelled to impose no discipline at all; findings that Judge Coomer may well have been merely negligent are not findings of bad faith by clear and convincing evidence. But the Hearing Panel also states that Judge Coomer "exploited" both Filhart and the "unique and fragile position of trust that attorneys and judges enjoy." That word — "exploited" — suggests intentional action.

47

Moreover, the Report and Recommendation suggested that Judge Coomer's introduction of character evidence may have backfired, undermining the notion that he acted out of an ignorance of the law:

> [F]rom the character witnesses [Judge Coomer] called to testify comes another powerful lesson: they — in particular his superior officer, Colonel [Lorraine M.] Mink, from the United States Air Force's Judge Advocate General Corps — saw in [Judge Coomer] a smart, capable leader who excelled in all that he did. Accepting this assessment as true, the Hearing Panel is left to conclude that [Judge Coomer], deemed to be in the top one percent of officers Colonel Mink had ever met, knew exactly what he was doing when he [acted in the manner alleged in the various counts].

In context, we cannot determine whether this is a bright-line factual finding that every violation of law and rules by Judge Coomer was done knowingly, or whether it is merely a final rhetorical flourish. It certainly is at odds with other statements in the Report and Recommendation suggesting that the Hearing Panel is uncertain that Judge Coomer knowingly violated the various rules at issue, especially the statement that "there are too many examples of both [violator or uninformed]." And that difference matters a great deal. Knowing violation of the law would likely satisfy bad

48

faith; mere negligence plainly would not.

7. *Conclusion.*

In sum, the Hearing Panel made two critical errors of law. It erroneously determined that Judge Coomer's conduct before he became a judicial candidate was the proper subject of discipline. And it erroneously determined that negligent conduct outside the judicial capacity could warrant discipline, when our case law makes clear that conduct outside the judicial capacity must be done with bad faith to warrant discipline.

Those errors require us to end where we began — with the standard of review. As we said at the outset, in determining whether to accept the Hearing Panel's recommendation, we review legal determinations de novo but we defer to factual findings. Intent was a matter of enormous dispute in this matter, and this Court is not well positioned to resolve the factual questions of intent that are crucial to determining whether discipline is constitutionally permitted. The Hearing Panel heard dozens of hours of testimony related to that topic and observed the people offering that testimony;

the Hearing Panel — not this Court — is best positioned to resolve those questions. We therefore must remand for the Hearing Panel to engage in that work.

The Hearing Panel is directed to issue new findings that (1) determine which counts against Judge Coomer that were proved by clear and convincing evidence are properly within the scope of the Code of Judicial Conduct; (2) clearly articulate which counts, if any, may support discipline within the constitutional framework as articulated in this opinion, with particular attention toward whether the Director proved bad faith for any of those counts; and (3) reconsider what, if any, discipline is appropriate based on the revised findings.[13] The Hearing Panel is directed to file that new Report and Recommendation with this Court within 60 days of the

---

[13] We also direct the Hearing Panel to use more precision in making factual findings in support of its conclusions regarding whether the Director has proved the various charges against Judge Coomer, particularly whether Judge Coomer represented Filhart at the time of the conduct at issue in Counts 6 and 20 (if those counts are still determined to have been proved), and as to which particular campaign expenditures Judge Coomer violated the law by failing to disclose on his December 31, 2018 Campaign Contribution Disclosure Report (again, if the count(s) involving that report are determined to have been proved). We also direct the Panel to include complete record citations, including citations to the final hearing transcript.

date of this opinion. We leave it to the Hearing Panel to set a schedule for obtaining briefing from the parties as to the questions now before it.

*Matter remanded with direction. All the Justices concur, except Bethel, J., not participating, and Colvin, J., disqualified.*

# APPENDIX 1

# IN THE SUPREME COURT
## STATE OF GEORGIA

)
)
*In re:* Formal Advisory Opinion 242 ) Case No. _____
)
)
)

## JQC Formal Advisory Opinion 242

The Judicial Qualifications Commission's ("Commission") Hearing Panel respectfully submits the attached Formal Advisory Opinion (Exhibit A) to the Court pursuant to Commission Rule 28(B)(4). The Commission's Investigative Panel, invoking Commission Rule 28(B)(1), requested that the Hearing Panel issue a formal advisory opinion. The Hearing Panel made a preliminary determination that a proposed formal advisory opinion should be drafted on the issue presented by the Investigative Panel. The Hearing Panel subsequently authored and then published a proposed Formal Advisory Opinion 242 on the websites of the Commission, the Administrative Office of the Courts, and the State Bar of Georgia on 6 March 2018. Consistent with Commission Rule 28(B)(3), the Hearing Panel invited public comments on proposed Formal Advisory Opinion 242 through 23 March 2018. After due consideration of those comments, the Hearing Panel made minor changes to the proposed formal advisory opinion.

The Hearing Panel now files Formal Advisory Opinion 242 with the Court and will also publish it on the websites listed above. The Hearing Panel or any person "aggrieved" by Formal Advisory Opinion 242 has twenty days from the date of this filing to petition the Court for discretionary review.[1] Commission Rule 28(B)(4). The Court may also review the opinion *sua sponte*. *Id.*

With this explanation, the Hearing Panel respectfully submits Formal Advisory Opinion 242 to the Court.

This 15 day of May, 2018.

Hon. Robert C.I. McBurney
Presiding Officer
Judicial Qualifications Commission Hearing Panel

---

[1] The Hearing Panel does not intend to seek discretionary review from the Court at this time.

**EXHIBIT A**

JUDICIAL QUALIFICATIONS COMMISSION

STATE OF GEORGIA

**FORMAL ADVISORY OPINION No. 242**

Pursuant to Rule 28(B) of the Rules of the Judicial Qualifications Commission (JQC), the Investigative Panel of the JQC has requested that the Hearing Panel of the JQC issue an opinion on whether the Code of Judicial Conduct, which governs both judges and judicial candidates (as defined in the Code and discussed below), applies to conduct by a non-judge before that person becomes a judicial candidate. This question appears not have been addressed in any earlier JQC Advisory Opinion. For the reasons set forth below, the Hearing Panel concludes that such conduct is not governed by the Code.

It is alleged that a candidate for judicial office in Georgia has engaged in conduct arguably violative of the Code. However, it appears that the alleged misconduct occurred *before* the individual became a judicial candidate. A complaint concerning this conduct has been presented to the Investigative Panel.

The Code of Judicial Conduct applies to "[a]nyone … who performs a judicial function under the Constitution and laws of Georgia" as well as to "any person who is a judicial candidate for any such office." Application, Code of Judicial Conduct. A "judicial candidate" is any person "seeking selection for or

retention in judicial office by election or appointment." Terminology, Code of Judicial Conduct. One becomes such a candidate as soon as one

> (i) appoints or forms a campaign committee, (ii) makes a public announcement of candidacy, (iii) declares, files or qualifies as a candidate with the election or appointment authority, or (iv) authorizes solicitation or acceptance of contributions or support.

*Id.* Once the Code is applicable to an individual, that individual must *immediately* comply with all of the Code's provision (except for Rules 3.8 and 3.1(B) – (F)). Application, Section C.

What this examination of the Code makes clear is that someone who is not yet a judicial candidate -- and not already a judge -- is not governed by the provisions of the Code. Consequently, the Investigative Panel is without jurisdiction to consider complaints that are limited to allegations of misconduct that occurred *before* a non-judge became a judicial candidate.[1] While such allegations may well be fodder for campaign material, they do not fall within the Commission's purview.

---

[1] This Opinion does not address the specific facts that gave rise to the complaint to the Investigative Panel. They are, appropriately, not known to the Hearing Panel. It is for the Investigative Panel to determine whether the individual in question, now purportedly a judicial candidate, was a judicial candidate, as defined by the Code, when the complained-of behavior occurred.

2

# APPENDIX 2

# JUDICIAL QUALIFICATIONS COMMISSION

## AMENDMENT PROPOSAL

To:        The Supreme Court of Georgia

From:      The Investigative Panel of the Judicial Qualifications Commission

Date:      September 24, 2018

Re:        Proposed Amendments to the Georgia Code of Judicial Conduct (the "Code") and the Rules of the Georgia Judicial Qualifications Commission

## Introduction

Pursuant to Judicial Qualifications Commission Rule 3.E (1)(b), the Investigative Panel of the Commission has "the duty and authority to . . . propose amendments to the Georgia Code of Judicial Conduct and these [Commission] Rules, subject to review and adoption by the Supreme Court." After several revisions and a public comment period, the Investigative Panel now proposes amendments addressing three issues: (1) jurisdiction over judges elect, (2) jurisdiction over the prior misconduct of judges and judicial candidates, and (3) which provisions of the Code should apply to judicial candidates.

## I.      The Commission has jurisdiction over judges elect.

Several Commissioners and others have posed questions as to the Commission's jurisdiction, including the extent to which the Commission may discipline judges elect, that is, those individuals who are duly elected or appointed to office but have not yet officially assumed office. The Code explicitly gives the Commission jurisdiction to discipline judicial candidates and sitting judges for misconduct. (See Code, *Preamble* ¶ 3; *Application* ¶ 1.) It does not, however, clearly speak to judges elect who are no longer judicial candidates but not yet sitting judges.

The Investigative Panel proposes amending the Code and Rules to explicitly make judges elect subject to the Commission's jurisdiction. Such amendments prevent anomalous situations where a judge elect commits misconduct that would typically constitute grounds for discipline or removal, but the Commission could not formally act on that misconduct until the judge elect formally assumed office. For example, if a judge elect were to start making speeches for political organizations or publicly endorsing other candidates for public office in violation of Rule 4.1 (A), it is uncertain that the Commission has the power to act until the individual assumes judicial office

because the Code and Rules only speak to judges and judicial candidates. Likewise, a judge elect could commit a felony and remain beyond the Commission's authority until assuming office. Amending the Code and Rules to specify that judges elect remain subject to the Code as "judicial candidates" removes that uncertainty.[1]

The Supreme Court could make this amendment with the addition of a sentence in the Code and Rules noting that judges elect are still "judicial candidates" subject to the Code. This addition could be made in the definition of judicial candidate, which is identical in the Terminology sections of the Code and Rules.[2]

**Terminology (Page 3 in Rules and Page 7 in the Code)**

**"Judicial candidate"** is a person, including an incumbent judge, seeking selection for or retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she: (i) appoints or forms a *campaign committee*, (ii) makes a public announcement of candidacy, (iii) declares, files or qualifies as a candidate with the election or appointment authority, or (iv) authorizes solicitation or acceptance of *contributions* or *support*. <u>A person who is announced as the appointee to fill a judicial position by the Governor or other appointing authority, or who is certified as elected to a judicial position, continues to be a *judicial candidate* until he or she is sworn into office.</u> ~~The term "judicial candidate" has the same meaning when applied to a judge seeking election or appointment to non-judicial office.~~

Finally, the Investigative Panel proposes deleting the last sentence from the definition. That sentence is a vestige of the old Code and is unnecessary given Rule 4.5's new "resign-to-run provision." That provision now specifically addresses judges who are seeking election or appointment to non-judicial office.

II. **The Commission has jurisdiction over the prior misconduct of judges to the extent it implicates the judge's current integrity, impartiality, and competence. The Commission has no jurisdiction over the prior misconduct of judicial candidates.**

The Code and the Commission's Rules are at odds regarding jurisdiction over misconduct that occurs before an individual becomes a judge or judicial candidate.[3] The Code provides for jurisdiction over "allegations of misconduct occurring *during* the individual's service as a judge,

---

[1] "Judicial Candidates" refers to both candidates and judges elect for the remainder of this proposal.
[2] Text that appears unaltered is the text presently, underlined text is a proposed addition, stricken text is a proposed deletion.
[3] The Commission's Hearing Panel recently issued proposed Formal Advisory Opinion 242, which found that the Code did not apply to the pre-candidacy conduct of an individual who was not otherwise a judge because that person was not a judicial candidate or exercising a judicial function at the time.

judicial candidate, or an officer of a judicial system." (Code *Application*, Part D.) The Commission's Rules, on the other hand, provide for jurisdiction over "allegations that misconduct occurred *before or during* service as a judge or judicial candidate." (Rule 2.B (2).)

The Investigative Panel proposes amending the Code, Application Section, Part D, adding a new commentary to Rule 1.2 of the Code, and deleting the words "before or" from Commission Rule 2.B (2), to reflect its jurisdiction over certain misconduct that occurred before an individual becomes a judge and its lack of jurisdiction over the prior misconduct of judicial candidates:

### D. Ongoing Disciplinary Authority

In addition to the foregoing, the appropriate authority for judicial discipline shall have continuing jurisdiction over individuals to whom this Code is applicable regarding allegations ~~of misconduct occurring during the individual's service as a judge, judicial candidate, or an officer of a judicial system,~~ that violations of the Code occurred during the individual's service as a judge or judicial candidate or allegations that the individual engaged in conduct prior to service as a judge that impairs the individual's current ability to carry out judicial responsibilities with integrity, impartiality, and competence, if a complaint is filed no later than one year following that service. See Rule 1.2, *Commentary [6]*.

### Rule 1.2 Promoting Public Confidence in the Judiciary

Commentary:

[6] On rare occasions, violations of the Code may be based on conduct occurring before the individual became a judge. For example, a judge may commit a serious crime before becoming a judge that is not discovered until after the judge takes office. That prior crime may undermine the judge's current integrity, impartiality, or competence such that it impairs the judge's ability to carry out official duties in conformance with the Code. In general, however, a judge's prior conduct will not serve as the basis for a violation of the Code. For example, most judges practiced law before assuming judicial office. Although full-time judges are generally prohibited from practicing law under Rule 3.10, that prior conduct is obviously not a basis for a violation of the Code because it does not affect the judge's current compliance with the Code. Likewise, a judge may have committed a minor crime, years prior to taking office, that indicates no current inability to comply with the Code. In sum, an individual's actions prior to becoming a judge may constitute a violation of the Code only to the extent that prior acts reflect on the judge's current integrity, impartiality, or competence.

### Commission Rule 2.B (2)

(2) Former Judges. The Commission has continuing jurisdiction over former judges regarding allegations that misconduct occurred ~~before or~~ during service as a judge

3

or judicial candidate if a complaint is made within one year following service as a judge or judicial candidate.

The proposed amendments clarify two points with respect to Commission jurisdiction. First, the addition of the commentary clarifies what types of conduct—prior to a judge assuming the bench—the Commission may look to as a potential violation of the Code. Prior misconduct that implicates the judge's current abilities should be subject to Commission jurisdiction. Minor or youthful indiscretions should not.

Second, the amendment to Part D's language illustrates a key distinction between the prior misconduct of judges as opposed to the prior misconduct of judicial candidates. The Commission has a duty to investigate the relevant misconduct of judges or former judges whether it occurred before or during the individual's judgeship. In fact, the Constitution explicitly gives the Commission this duty in cases involving the indictment of a judge, regardless of when the conduct underlying the indictment occurred. (GA. CONST. Art. VI, § VII. Para. VII.) Likewise, the Commission has a public interest in addressing the campaign misconduct of judicial candidates or former judicial candidates. However, Commission jurisdiction over the misconduct of a judicial candidate that occurs prior to his or her candidacy, if the candidate never becomes a judge, is another matter. That issue is properly suited for the voters to consider during a judicial campaign, and likely fodder for the candidate's opposition and the press. Thus, Part D's amendment shows that the Commission has jurisdiction over misconduct that occurred during service as a judge or judicial candidate, but the Commission only has jurisdiction over the prior misconduct of judges. This amendment protects the Commission's interest in an ethical judiciary while keeping the Commission out of unnecessary political issues.

### III. Judicial candidates should be subject to the same Code provisions as judges pro tempore.

In looking at the Commission's jurisdiction with respect to judges elect, the question arose as to what provisions of the Code apply to judicial candidates as opposed to judges. The Code's application provides that "[a]nyone, whether or not a lawyer, who performs judicial functions under the Constitution and laws of Georgia, including an associate judge, senior judge, special master, magistrate, or municipal judge, or any person who is a judicial candidate for any such office, is a judge for the purpose of this Code." On the other hand, only Canon 4 of the Code—governing political activity and campaign conduct—explicitly mentions its application to judicial

4

candidates. These two provisions appear at odds because the application section instructs the Commission to treat judicial candidates as "judges" under the Code while only Canon 4 explicitly applies to judicial candidates.

Furthermore, properly determining what Code sections apply to judges as opposed to judicial candidates is of great practical importance. For example, Canon 3 prohibits "judges" from acting as arbitrators or mediators for compensation or from practicing law. Prohibiting judicial candidates from such activities would impose an undue financial hardship on many and is inconsistent with how this Commission has enforced and interpreted the Code. On the other hand, only applying Canon 4 to judicial candidates leaves too much misconduct beyond the purview of the Code. For example, a judicial candidate who wins an election should not trade on the prestige of his or her future judicial office for private gain. If only Canon 4 applied to judicial candidates, this may be permissible conduct. (See Rule 1.1 (requiring judges to act in a manner that promotes the public confidence in the independence, integrity, and impartiality of the judiciary); Rule 1.3 (prohibiting judges from lending the prestige of their office to advance the private interests of the judge or others).)

The Investigative Panel proposes applying the same Code provisions to judicial candidates as judges pro tempore. This strikes a proper balance between upholding the integrity of the judiciary and ensuring that judicial candidates are not unduly burdened by the full Code. The Code's application provides that judges pro tempore are not required to comply with the following rules of the Code,

- Rule 3.4 [extra-judicial appointments],
- Rule 3.8 [fiduciary activities],
- Rule 3.9 [arbitration and mediation],
- Rule 3.10 [practice of law],
- Rule 3.11 [financial activities], and
- Rule 3.15 (A)(1) [annual financial reporting of quasi-judicial and extra-judicial compensation].

Exempting judicial candidates from these strictures of Canon 3 ensures that candidates do not face undue hardship when seeking judicial office by allowing them to practice law, serve in extra-judicial roles, and serve as mediators or arbitrators for pay among other things, in other

5

words, to engage in business related to the practice of law. At the same time, Canons 1 and 2, which protect the impartiality and integrity of the judiciary, remain in force. Accordingly, the Investigative Panel proposes adding a sentence to the end of the definition of judicial candidate specifying that such candidates are subject to the same Code provisions as judges pro tempore.

**Terminology** (Page 3 in Rules and Page 7 in the Code)

**"Judicial candidate"** is a person, including an incumbent judge, seeking selection for or retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she: (i) appoints or forms a *campaign committee*, (ii) makes a public announcement of candidacy, (iii) declares, files or qualifies as a candidate with the election or appointment authority, or (iv) authorizes solicitation or acceptance of *contributions* or *support*. A person who is announced as the appointee to fill a judicial position by the Governor or other appointing authority, or who is certified as elected to a judicial position, continues to be a *judicial candidate* until he or she is sworn into office. ~~The term "judicial candidate" has the same meaning when applied to a judge seeking election or appointment to non-judicial office.~~ Judicial candidates who do not currently hold judicial office are subject to the same Code provisions as judges pro tempore.

Additionally, the Investigative Panel proposes adding a second paragraph to the commentary section under the definition of judges pro tempore to reference the change above.

Commentary:

[1] These Rules contemplate . . . infrequent periods of time.

[2] Judicial candidates who do not currently hold judicial office are subject to the same Code provisions as judges pro tempore. See Terminology Section, definition of *judicial candidate.*

## Conclusion

For these reasons, the Investigative Panel respectfully requests that the Supreme Court consider and adopt these proposed amendments to the Georgia Code of Judicial Conduct and the Rules of the Georgia Judicial Qualifications Commission.

Decided March 15, 2023.

Judicial discipline.

*Charles P. Boring, Courtney M. Veal, Anna G. Cross*, for Judicial Qualifications Commission.

*Copeland Stair Valz & Lovell, Mark D. Lefkow; Cathey & Strain, Dennis T. Cathey; Stites & Harbison, Johannes S. Kingma*, for Coomer.